

U.S. Department of Justice

United States Attorney
District of Maryland

Jeffrey J. Izant
Assistant United States Attorney
jeffrey.izant@usdoj.gov

36 South Charles Street
Suite 400
Baltimore, MD 21201-3119

DIRECT: 410-209-4982
MAIN: 410-209-4800
FAX: 410-962-0716

December 17, 2019

Elizabeth G. Oyer, Esq.
Assistant Federal Public Defender
Office of the Federal Public Defender
100 S. Charles Street, Tower II, 9th Floor
Baltimore, Maryland 21201
liz_oyer@fd.org

**BY ELECTRONIC AND INTEROFFICE MAIL**

  Re: <u>United States v. Ahmad Kazzelbach</u>, Criminal No. JKB-19-0530

Dear Counsel:

  This letter, together with the Sealed Supplement, confirms the plea agreement (the "Agreement") that has been offered to your client, Ahmad Kazzelbach (hereinafter the "Defendant"), by the United States Attorney's Office for the District of Maryland (the "Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **Thursday, January 9, 2019**, it will be deemed withdrawn. The terms of the Agreement are as follows:

### Offense(s) of Conviction

  1. The Defendant agrees to plead guilty to Counts One and Two of a Criminal Information charging the Defendant with cyberstalking, in violation of 18 U.S.C. § 2261A(2)(B), and intentional damage to a protected computer, in violation of 18 U.S.C. § 1030(a)(5)(A). The Defendant admits that he is, in fact, guilty of the offense(s), and will so advise the Court.

### Elements of the Offense(s)

  2. The elements of the offense(s) to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows.

**Count One: Cyberstalking**

  a. That, during the time period alleged in the Criminal Information, in the District of Maryland –

i. The Defendant intended to kill, injure, harass, or intimidate another person;

ii. The Defendant used the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct; and

iii. The course of conduct caused, attempted to cause, or was reasonably expected to cause substantial emotional distress to that person or an immediate family member.

**Count Two: Intentional Damage to a Protected Computer**

b. That, on or about August 28, 2016, in the District of Maryland –

i. The Defendant knowingly caused the transmission of a program, information, code, or command;

ii. The Defendant intentionally caused damage to a protected computer without authorization; and

iii. The Defendant's offense caused, or would—if completed—have caused, the modification or impairment, or the potential modification or impairment, of the medical examination, diagnosis, treatment, or care of one or more individuals.

## Penalties

3. The penalties provided by statute for each offense to which the Defendant is pleading guilty are as follows:

| Count | Statute | Min. Prison | Max. Prison | Supervised Release | Max. Fine | Special Assessment |
|---|---|---|---|---|---|---|
| One | 18 U.S.C. §§ 2261A(2)(b), 2261(b)(5) | N/A | 5 years | Max: 3 years | $250,000 | 18 U.S.C. § 3013(a): $100 |
| Two | 18 U.S.C. § 1030(a)(5)(A), (c)(4)(A)(i)(II), (c)(4)(B) | N/A | 10 years | Max: 3 years | $250,000 | 18 U.S.C. § 3013(a): $100 |

a. *Prison*: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b. *Supervised Release*: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant

returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

        c.     *Restitution*: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

        d.     *Payment*: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

        e.     *Forfeiture*: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

        f.     *Collection of Debts*: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (i) the full amount of the fine or restitution is nonetheless due and owing immediately; (ii) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (iii) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

## Waiver of Rights

4.     The Defendant understands that, by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

        a.     The Defendant has the right to have the case presented to a Grand Jury, which would decide whether there is probable cause to return an indictment against the Defendant. By agreeing to proceed by way of Criminal Information, the Defendant is giving up that right, and understands that the charges will be filed by the United States Attorney without the Grand Jury.

        b.     If the Defendant had pleaded not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

        c.     If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity

to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

        d.      If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

        e.      The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that it could not draw any adverse inference from the Defendant's decision not to testify.

        f.      If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed that would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

        g.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" provisions below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

        h.      If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced case, and the Court will find the Defendant guilty.

        i.      By pleading guilty, the Defendant also will be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that, if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can

predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551–3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991–98. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6. This Office and the Defendant (collectively, the "Parties") stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

### Count One: Cyberstalking of J.K.

a. This Office and the Defendant further agree that, pursuant to U.S.S.G. §2A6.2(a), the applicable base offense level for Count One is **18**.

b. The Parties further agree that, pursuant to U.S.S.G. §2A6.2(b)(1)(E), there is a 2-level increase because the offense involved a pattern of activity involving stalking, threatening, harassing, or assaulting the same victim. [Subtotal: 20.]

c. The Parties further agree that, pursuant to U.S.S.G. §3C1.1, there is a 2-level increase because the Defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation or prosecution of the instant offense of conviction, and the obstructive conduct related to the Defendant's offense of conviction and any relevant conduct or a closely related offense. [Subtotal: 22.]

### Count Two: Intentional Damage to a Protected Computer

d. This Office and the Defendant agree that, pursuant to U.S.S.G. §2B1.1(a)(2), the applicable base offense level for Count Two is **6**.

e. The Parties further agree that, pursuant to U.S.S.G. §2B1.1(b)(18)(A), there is a 2-level increase because the Defendant was convicted of an offense under 18 U.S.C. § 1030 and the offense involved an intent to obtain personal information. [Subtotal: 8.]

f. The Parties further agree that, pursuant to U.S.S.G. §2B1.1(b)(19)(A)(ii), there is a 4-level increase because the Defendant was convicted of an offense under 18 U.S.C. § 1030(a)(5)(A). [Subtotal: 12.]

g. The Parties further agree that, pursuant to U.S.S.G. §3B1.3, there is a 2-level increase because the Defendant abused a position of private trust in a manner that significantly facilitated the commission or concealment of the offense. [Subtotal: 14.]

h. The Parties further agree that, pursuant to U.S.S.G. §3C1.1, there is a 2-level increase because the Defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation or prosecution of the instant offense of conviction, and the obstructive conduct related to the Defendant's offense of conviction and any relevant conduct or a closely related offense. [Subtotal: 16.]

**Relevant Conduct: Attempted/Completed Unauthorized Access to Protected Computers**

i. The Statement of Facts set forth in Attachment A to this Agreement specifically establishes the commission of additional offenses other than those to which the Defendant has agreed to plead guilty. This Office and the Defendant further agree that, pursuant to U.S.S.G. §1B1.2(c), the additional offenses are treated as if the Defendant had been convicted of additional counts charging those offenses.

j. This Office and the Defendant agree that, pursuant to U.S.S.G. §2B1.1(a)(2), the applicable base offense level for unauthorized access to a protected computer is 6.

k. The Parties further agree that, pursuant to U.S.S.G. §2B1.1(b)(10)(C), there is a 6-level increase because the offense involved sophisticated means and the Defendant intentionally engaged in or caused the conduct constituting sophisticated means. [Subtotal: 12.]

l. The Parties further agree that, pursuant to U.S.S.G. §2B1.1(b)(11)(C)(i), there is a 2-level increase because the offense involved the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification. [Subtotal: 14.]

m. The Parties further agree that, pursuant to U.S.S.G. §2B1.1(b)(18)(A), there is a 2-level increase because the Defendant was convicted of an offense under 18 U.S.C. § 1030 and the offense involved an intent to obtain personal information. [Subtotal: 16.]

n. The Parties further agree that, pursuant to U.S.S.G. §3B1.3, there is a 2-level increase because the Defendant abused a position of private trust in a manner that significantly facilitated the commission or concealment of the offense. [Subtotal: 18.]

o. The Parties further agree that, pursuant to U.S.S.G. §3C1.1, there is a 2-level increase because the Defendant willfully obstructed or impeded, or attempted to obstruct or

impede, the administration of justice with respect to the investigation or prosecution of the instant offense of conviction, and the obstructive conduct related to the Defendant's offense of conviction and any relevant conduct or a closely related offense. [Subtotal: 20.]

### Grouping

p.  This Office and the Defendant further agree that, pursuant to U.S.S.G. §3D1.2, Count One, Count Two, and the Defendant's Relevant Conduct group together.

q.  The Parties further agree that, pursuant to U.S.S.G. §3D1.3(b), the applicable combined offense level is the highest offense level of the offenses in the group.

r.  Accordingly, the Parties agree that the combined offense level is **22**.

### Acceptance of Responsibility

s.  This Office does not oppose a 2-level reduction in the Defendant's combined offense level pursuant to U.S.S.G. §3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. §3E1.1(b) for an additional 1-level decrease, in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. §3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. §3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense(s); (iii) gives conflicting statements about the Defendant's involvement in the offense(s); (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7.  There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8.  Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Obligations of the Parties

9. At the time of sentencing, this Office will recommend that the Court sentence the Defendant to not more than 30 months' imprisonment. The Defendant reserves the right to advocate for a reasonable sentence, and both Parties reserve the right to advocate for any reasonable period or condition of supervised release, and/or fine, considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing.

## Defendant's Conduct Prior to Sentencing and Breach

10. Between now and the date of sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. §3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

11. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (a) this Office will be free from its obligations under this Agreement; (b) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C); and (c) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

## No Contact Order

12. While awaiting sentencing, and throughout the entirety of any term of imprisonment, the Defendant will not make any contact with, or take any steps whatsoever to locate, the victim identified as J.K. in the Criminal Information, or any immediate family member of J.K. The Defendant specifically agrees to the entry of a Protective Order regarding any contact with J.K. or immediate family member of J.K. The Defendant further agrees that this provision shall continue following his release and will be part of any supervised release conditions ordered by the Court at the time of sentencing. If the Defendant does not fulfill this provision, it will be considered a material breach of the Agreement, and this Office may seek to be relieved of its

obligations thereunder. The Defendant waives and agrees to waive any right to challenge any prosecution based on the statute of limitations or double jeopardy, and knowingly and voluntarily agrees to toll the limitations period through the end of his incarceration and supervised release.

## Restitution

13.  The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663A and 3771, the victim identified in the Criminal Information as J.K. is entitled to mandatory restitution. In exchange for the concessions made by this Office, the Defendant further agrees to the entry of a restitution order for the full amount of the losses incurred by J.K. as a result of the offense conduct set forth in Attachment A. Restitution could include legal fees, medical bills, lost wages, and counseling costs (including travel related thereto), if any such costs exist or are reasonably projected.

14.  The Defendant further agrees that the total amount of restitution shall be due immediately and shall be ordered to be paid forthwith. Any payment schedule imposed by the Court establishes only a minimum obligation. The Defendant hereby agrees to make a good faith effort to pay any restitution ordered. Regardless of the Defendant's compliance, however, any payment schedule does not limit the United States' ability to collect additional amounts from the Defendant through all available collection remedies at any time.

15.  The Defendant further agrees that the Defendant will fully disclose to this Office, the probation officer, and to the Court, subject to the penalty of perjury, all information (including but not limited to copies of all relevant bank and financial records) regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the Statement of Facts attached hereto. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill his restitution obligations, it will be considered a material breach of this Agreement, and this Office may seek to be relieved of its obligations under this Agreement.

## Forfeiture

16.  The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense(s).

    a.  Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in the following items that the Defendant agrees constitute money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities:

        i.  Apple MacBook model A1534, Serial No. C02QH0CWGCN3; and

        ii.  iPhone 7 Plus, Serial No. C38T3PLQHFY7.

b. The Defendant agrees to consent to the entry of an Orders of Forfeiture for the property described in the above subparagraph and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the change of plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

c. The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

17. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

### **Waiver of Appeal**

18. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute, to the extent such challenges legally can be waived.

b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term or condition of supervised release, or order of forfeiture or restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

i. The Defendant reserves the right to appeal any term of imprisonment to the extent that it exceeds any sentence within the advisory guidelines range resulting from an offense level of 19; and

      ii.  This Office reserves the right to appeal any term of imprisonment to the extent that it is below any sentence within the advisory guidelines range resulting from an offense level of 19.

19.  The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned case and agrees not to file any request for documents from this Office or any investigating agency.

## Consequences of Vacatur, Reversal, or Set-Aside

20.  If a conviction entered pursuant to this Agreement is vacated, reversed, or set aside for any reason, then this Office will be released from its obligations under this Agreement, and any prosecution that is not time-barred as of the date of the signing of this Agreement (including any counts this Office has agreed to dismiss) may be commenced or reinstated against the Defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. The Defendant agrees to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date this Agreement is signed, and any applicable statute of limitations will be tolled from the date of this Agreement until 120 days after the vacatur, reversal, or set aside becomes final. The Defendant waives any defenses based on double jeopardy, pre-indictment delay, or the Speedy Trial Act as to any time between the signing of this Agreement and the reinstatement of any prosecution.

## Court Not a Party

21.  The Defendant expressly understands that the Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

22.  This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties, and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Sincerely,

Robert K. Hur
United States Attorney

By: _____
Jeffrey J. Izant
P. Michael Cunningham
Assistant United States Attorneys

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

01/06/2020 AK
_____
Date

_____
Ahmad Kazzelbach

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement, with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

1/6/20
_____
Date

_____
Elizabeth G. Oyer, Esq.

# ATTACHMENT A
# STATEMENT OF FACTS

*The undersigned parties stipulate and agree that, if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

The victim, J.K., 27, was a resident of Baltimore, Maryland, and a health insurance broker with Company A, in Glen Burnie, Maryland. J.K. began working at Company A in June 2015.

The defendant, Ahmad Kazzelbach, 26, was a resident of Pasadena, Maryland, and was J.K.'s training agent when she began working at Company A. In December 2015, Kazzelbach and J.K. began a romantic relationship and moved into a shared apartment together.

In late May 2016, J.K. ended her relationship with Kazzelbach. Although Kazzelbach vacated their shared apartment, he subsequently began a year-long scheme to harass J.K. by compromising her personal online accounts, forging policy cancellation letters on behalf of her clients, and filing false reports with law enforcement that ultimately resulted in J.K. being wrongfully arrested and incarcerated on multiple occasions.

I. <u>Kazzelbach's Initial Electronic Harassment of J.K.</u>

Kazzelbach began compromising J.K.'s accounts on July 25, 2016, when he created a Yahoo email account that mimicked J.K.'s real email address, and verified the account using his brother's cell phone number. Within ten minutes, Kazzelbach changed the name on J.K.'s Apple account from her real email address to the fake one he created. Kazzelbach also accessed J.K.'s online student loan account, and changed the account email address to the fake one he created.

On July 27, 2016, Kazzelbach changed the username on J.K.'s Apple account to the fake email address and initiated a password reset. This caused Apple to send the new account password to the fake address, locking J.K. out of the account that controlled certain settings on her iPhone, as well as her access to the photos, music, and videos associated with her Apple account. And within hours of locking J.K. out of her Apple account, Kazzelbach accessed her Instagram account and changed a portion of her user name to the word "whore."

In late August 2016, Kazzelbach used a fax machine at Company A to send two fraudulent letters purporting to cancel supplemental health insurance policies belonging to two of J.K.'s clients, whose information Kazzelbach had access to through his position at Company A. Neither client had actually requested that the policies be cancelled at that time—Kazzelbach forged their signatures. After discovering that her policy had been cancelled, one of the two clients, D.V., requested that J.K. reinstate it. Reinstating the policy required D.V. to make another payment of her premium; but Company A had not deactivated D.V.'s monthly auto-debit, which resulted in an overdraft on her checking account, and caused D.V. to incur a loss of $35. (Soon after Company A confronted Kazzelbach about the forged letters in mid-September 2016, Kazzelbach chose to resign.)

On August 28, 2016, Kazzelbach accessed J.K.'s online health insurance platform, to which J.K. had previously given Kazzelbach limited access as her agent for the purpose of setting up her account. Through this access, Kazzelbach made unauthorized changes to J.K.'s race, pregnancy status, and income on the platform. The change that Kazzelbach made to her income resulted in her disqualification from the Medicaid plan in which she had been enrolled. Kazzelbach hereby stipulates and agrees that, as a result, his transmission of false information to J.K.'s health insurance platform caused the potential modification or impairment of the medical examination, diagnosis, treatment, or care of J.K.

On September 1, 2016, Kazzelbach attempted to access J.K.'s online bank account without authorization. As a result of Kazzelbach's multiple unsuccessful logins, J.K.'s online access to the account was temporarily blocked. And on October 1, 2016, Kazzelbach twice attempted to access J.K.'s online tax-filing account, to which J.K. had previously given Kazzelbach access in seeking his assistance with filing her tax returns. During both attempts, Kazzelbach sought access through proxy servers, which can be used to obfuscate a device's true location or identity. However, investigators were able to identify the true Internet Protocol ("IP") address from which Kazzelbach made these attempts, and determined that it had been assigned to a Verizon account subscribed to Kazzelbach's father—at a residence where Kazzelbach was then residing.

II.     Kazzelbach's False Charges Resulting in J.K.'s Arrest and Incarceration

On September 30, 2016, Kazzelbach sent a text message to J.K. in which Kazzelbach disguised his real identity by using a so-called "spoofing" program, which used computer software to make it appear as though the message to J.K. originated from a Florida-based cell phone number that did not belong to Kazzelbach. In the message, Kazzelbach wrote, "Prepare yourself for what's coming . . . the last 3 months were just the beginning. I have bigger plans for you. . . . I love how easily manipulated you can be."

On December 10, 2016, Kazzelbach filed a petition for a protective order against J.K. in the District Court of Maryland for Anne Arundel County ("AADC"). In the petition, Kazzelbach falsely alleged that J.K. had physically abused him and made violent threats in text messages and on social media. On December 13, Kazzelbach was granted a temporary protective order, and a hearing on a final protective order was scheduled for December 29, 2016.

Between December 13 and December 29, 2016, however, Kazzelbach contacted Anne Arundel County on the four occasions identified below to report falsely that J.K. was continuing to harass and threaten him in violation of the temporary protective order.

| Date | Means of Contact | Allegations | Purported Evidence | Process Issued |
|---|---|---|---|---|
| 12/22/16 | Kazzelbach appears at District Court | Harassment, destruction of property, protective order violations | Sworn affidavit by Kazzelbach | Arrest warrant 1 |
| 12/23/16 | PD responds to Kazzelbach home | Harassment, arson threat, protective order violations | Text messages and call logs on Kazzelbach's phone | Arrest warrant 2 |

| 12/24/16 | PD responds to Kazzelbach home | Protective order violation | Text message on Kazzelbach's phone | Arrest warrant 3 |
| 12/28/16 | PD responds to Kazzelbach home | Protective order violation | Text messages on Kazzelbach's phone | Arrest warrant 4 |

Thus, over the six-day period surrounding Christmas in 2016, Kazzelbach's false reports caused AADC to issue four warrants for J.K.'s arrest. The first warrant issued on the basis of Kazzelbach's sworn statement. The following three issued under applications for charges completed by officers from the Anne Arundel Police Department ("AAPD") after Kazzelbach showed them text messages and phone calls on his phone that he had spoofed to make it appear that J.K. had contacted him when, in reality, she had not.

On December 29, 2016, Judge John P. McKenna, Jr. conducted a hearing on Kazzelbach's protective order. Under oath, and representing herself *pro se*, J.K. unequivocally denied committing any of the alleged conduct. Among other things, J.K. stated that she could not have contacted Kazzelbach on the dates alleged because he had changed his phone number, which had been shielded from her in court records. J.K. also explained that she was trying to subpoena her service provider for records that would disprove Kazzelbach's allegations, and asked the court for more time to obtain documents. Judge McKenna nonetheless denied her request and issued Kazzelbach a final protective order against J.K., effective for a period of one year.

On January 3, 2017, J.K. was arrested by Baltimore County Police Department ("BCPD") officers serving the first AADC warrant. J.K. was transported to the Windsor Mill station, where she spent the night in custody.

On January 4, 2017, J.K. was transferred to the Baltimore County Detention Center, where she was served with the second and third AADC warrants. J.K. then made her initial appearance in Baltimore County in all three cases, and was held without bond pending a commitment hearing.

The same day—while J.K. was in Baltimore County custody, and without access to her personal effects, including her electronic devices—Kazzelbach contacted AAPD to report that J.K. had, earlier in the day, sent him text messages and an email in violation of the final protective order, including a message in which she purportedly threatened his life. After Kazzelbach showed the responding officer the alleged threat, which Kazzelbach had spoofed, the officer applied for charges alleging, among other things, that J.K. had violated the protective order. This led AADC to issue a fifth warrant for J.K.'s arrest. Records later obtained from Kazzelbach's service provider, however, reflected no text communications between J.K. and Kazzelbach the entire day.

On January 5, 2017, J.K. was released from commitment in Baltimore County and transferred to the custody of Anne Arundel County. She then made her initial appearance in AADC on warrants four and five, and was held without bond pending a commitment hearing, which was held the following day, January 6. Following the hearing, J.K. was released from custody—after having spent three nights in as many detention facilities.

The next day, January 7, 2017, Kazzelbach again summoned AAPD to his residence to report falsely that J.K. had sent him four threatening text messages that day. Based on

3

Kazzelbach's false report and a series of spoofed messages that he presented to the responding officer, the officer charged J.K. with violating a protective order, harassment, witness retaliation, and email harassment. AADC then issued an arrest warrant for J.K., but later recalled it and issued a criminal summons instead.

As the chart below reflects, Kazzelbach made similar false reports to AAPD on three more occasions in January and February 2017. Each time Kazzelbach presented AAPD officers with spoofed text messages that made it appear J.K. had messaged him when, in reality, she had not.

| Date | Means of Contact | Allegations | Purported Evidence | Process Issued |
|---|---|---|---|---|
| 1/4/17 | PD responds to Kazzelbach home | Protective order violation, harassment, email harassment | Text message on Kazzelbach's phone | Arrest warrant 5 |
| 1/7/17 | PD responds to Kazzelbach home | Protective order violation, harassment, witness retaliation, email harassment | Text messages on Kazzelbach's phone | Arrest warrant 6 (recalled); Criminal summons 1 |
| 1/10/17 | PD responds to Kazzelbach home | Protective order violation | Text message on Kazzelbach's phone | Criminal summons 2 |
| 1/11/17 | PD responds to Kazzelbach home | Protective order violation | Text message on Kazzelbach's phone | Criminal summons 3 |
| 2/24/17 | PD responds to Kazzelbach home | Protective order violation | Text message on Kazzelbach's phone | Arrest warrant 7 (recalled); Criminal summons 4 |

Around late March 2017, Kazzelbach met with the county prosecutor investigating the charges that Kazzelbach filed against J.K. The prosecutor asked for Kazzelbach's consent to download the contents of his iPhone, but Kazzelbach refused, stating that he would permit only a restricted download. The prosecutor told Kazzelbach that, if he did not permit a full search of his phone, the Anne Arundel charges against J.K. would be dismissed.

In response, Kazzelbach began making false reports to Baltimore County instead. On April 26, 2017, Kazzelbach contacted BCPD through 911 to report falsely that J.K. had violated the protective order on April 9. On April 29, Kazzelbach again falsely reported to BCPD that J.K. had violated the protective order by emailing him from her work account earlier that day. And on May 5, Kazzelbach falsely reported to BCPD that J.K. had violated the protective order on April 26.

Knowing that it would result in the dismissal of charges against J.K., on May 12, 2017, Kazzelbach confirmed to Anne Arundel County that he would not permit an unrestricted download of his iPhone. But on May 14—just two days later—Kazzelbach appeared at AAPD's headquarters and filed a report alleging falsely that, on May 12, J.K. had emailed him from her work account and threatened his life. Kazzelbach showed an officer an email that Kazzelbach spoofed to make it appear it was sent by J.K. In response, the officer sought charges alleging that J.K. again violated the protective order, causing AADC to issue an eighth arrest warrant for J.K.

On May 15, 2017, Anne Arundel County dismissed eight of the ten criminal cases in which J.K. had been charged based on Kazzelbach's allegations. (The remaining two were dismissed

4

three days later.) Nonetheless, Kazzelbach appeared the same day at BCPD's White Marsh precinct and reported falsely that, earlier that day, J.K. sent him a threatening email from her work account in violation of the AADC protective order.

Two days later, on May 17, 2017, Kazzelbach appeared again at the BCPD's White Marsh precinct and reported falsely that, on May 16, J.K. sent him an email from her work account in violation of the protective order. On May 24, Kazzelbach appeared yet again at BCPD's White Marsh precinct and reported falsely that J.K. had continued to violate the AADC protective order by emailing him from her work account on April 22 and May 23.

On June 14, 2017, Kazzelbach falsely reported to BCPD that J.K. had again violated the AADC protective order by messaging him on April 22. Accordingly, a BCPD detective applied for charges alleging that J.K. had committed multiple protective order violations, arson/threat, and witness intimidation. Based on these charges, J.K. was arrested by BCPD on June 22, 2017, and transferred to the Baltimore County Detention Center, where she was held overnight. The following day, a judge ordered J.K released to home detention and electronic monitoring.

In sum, between December 2016 and June 2017, Kazzelbach made 18 false reports to law enforcement, causing 11 criminal actions to be filed against J.K. in Anne Arundel and Baltimore Counties, and resulting in her false imprisonment for 4 nights. Kazzelbach hereby stipulates and agrees that it was reasonably foreseeable that this conduct would cause J.K. to suffer substantial emotional distress. Kazzelbach's conduct also significantly stunted J.K.'s career growth. According to Company A management, J.K. had previously been identified as a candidate for leadership positions, but her multiple court appearances and incarceration prevented the Company from providing her with the necessary training and experience for a substantial period of time.

III. BCPD's Investigation of Kazzelbach

BCPD eventually began its own investigation. Detectives reviewed Kazzelbach's cellular service records and discovered there were no attempted or completed text message communications between Kazzelbach and J.K. on the dates and times when Kazzelbach alleged that he had received text messages from her. Company A also reviewed its electronic records and determined that no completed or attempted email communications were sent from J.K.'s account to Kazzelbach on April 29, May 12, May 15, May 16, or May 23—as Kazzelbach had alleged.

On June 27, 2017, Kazzelbach emailed one of the BCPD officers conducting the investigation to report falsely again that J.K. had sent him a threatening message, which he attached to his email. The next day, Kazzelbach appeared at the White Marsh precinct, was advised of and waived his <u>Miranda</u> rights, and agreed to be interviewed by detectives. Kazzelbach explained that, since his relationship with J.K. ended in May 2016, he had changed his phone number twice, and had not provided the new numbers to J.K. He could not explain how J.K. continued to contact his phone without this information. Kazzelbach also consented to a search of his phone, but BCPD recovered almost no data from it. The phone did, however, contain emails that Kazzelbach allegedly received from J.K.'s work and personal accounts.

5

Detectives also interviewed J.K. on June 28, 2017. After being advised of and waiving her Miranda rights, she denied making any of the above-described changes to her online accounts, and denied ever communicating threats to Kazzelbach. J.K. also consented to a search of her phone, which revealed no attempted or successful text or email communication with Kazzelbach on the dates and times when Kazzelbach reported receiving messages from her. J.K.'s phone did, however, contain data reflecting ordinary, unrelated usage during this period of time.

Kazzelbach was interviewed again on August 1, 2017. After being advised of and agreeing to waive his Miranda rights, Kazzelbach was asked why his phone appeared to have almost no data on it. Kazzelbach stated that it was his habit to routinely delete data from his phone, and that he used three different iPhones during the period of time under investigation. Kazzelbach again claimed that he did not know how J.K. could have learned about his new phone numbers. Kazzelbach did acknowledge, however, that he knew what "spoofing" was, and admitted that, on at least one occasion, he visited Website A, a foreign spoofing website, after a friend told him that the site could be used to spoof electronic communications.

IV. Kazzelbach's Arrest and Post-Arrest Interview

On January 18, 2019, Kazzelbach was arrested by agents from the Federal Bureau of Investigation ("FBI"). Kazzelbach was again advised of and waived his Miranda rights, both verbally and in writing, and agreed to speak with FBI agents. Although Kazzelbach initially claimed not to have been involved in or recall certain conduct described above, he eventually admitted, among other things, that:

- He changed J.K.'s account information with Apple, Facebook, and Instagram;
- J.K. had previously given him the login information for her student loan account;
- He had access to J.K.'s online tax-filing account because he had previously helped J.K. file her taxes;
- He forged the cancellation letters purportedly written by J.K.'s clients;
- He sent the "anonymous" September 30, 2016, text message;
- He used Website A to spoof messages to himself;
- He spoofed messages to himself each time he called police to report falsely that J.K. had violated the protective order; and

6

- He started making false reports to Baltimore County because he "didn't like" the way Anne Arundel County was "treating" him.

SO STIPULATED:

_____
Jeffrey J. Izant
P. Michael Cunningham
Assistant United States Attorneys

_____
Ahmad Kazzelbach
Defendant

_____
Elizabeth G. Oyer, Esq.
Counsel for Defendant

7